John BRIGGS and Mary Briggs,
Plaintiffs in Error,

v.

SARKEYS, INC., an Oklahoma Corporation,
S. J. Sarkeys, an individual, and Sinclair
Oil & Gas Company, a Maine Corporation,
Defendants in Error.

No. 41266.

Supreme Court of Oklahoma.

Sept. 27, 1966.

Paul Brown, Brown, Verity & Brown, and Eugene O. Kuntz, McAfee, Dudley, Taft, Cates, Kuntz & Mark, Oklahoma City, for plaintiffs in error.

Angus A. Davidson, Ted D. Foster, Jr., Mark Singletary, Tulsa, for defendant in error, Sinclair Oil & Gas Co.

George Bingaman, Bingaman & Smith, Purcell, T. Murray Robinson, Wm. N. Christian, Robinson, Robertson & Barnes, Oklahoma City, for defendant in error, Sarkeys, Inc. and S. J. Sarkeys.

HALLEY, Chief Justice.

This is an action brought by John and Mary Briggs, husband and wife, plaintiffs in error here, to cancel or modify an oil and gas lease. Defendants in Error are Sarkeys, Inc., an Oklahoma Corporation, S. J. Sarkeys, an individual, and Sinclair Oil and Gas Company, a Maine corporation. Judgment below was adverse to the Briggs', and they appeal. We will refer to the parties by their trial court designation, that is, the Briggs as plaintiffs and the other parties as defendants and/or separately by their respective names.

Because of the nature of the controversy here, it will be necessary to set out the evidence in some detail. The facts, as disclosed by the evidence, showed that in August, 1950, John and Mary Briggs purchased from George and Irena Epperly, the following described real property located in Dewey County, Oklahoma:

N½ of NE¼ and the SW¼ of NE¼ and N½ of the SE¼ of Section 19, and Lots 5 and 6 (in the W½ of NE¼ of Section 30) Township 17 North, Range 17 West.

Shortly after the consummation of this sale, John and Mary Briggs moved onto the property, and since that time have owned the surface and all the minerals save and except 80 acres of the minerals under said land.

The evidence further showed that in this area the Canadian River flows generally from the north to the south and abuts the Briggs' property on the east, particularly the land located in Section 30. Lot 5 of Section 30, as originally patented, contained 39.35 acres. Lot 6, as originally patented, contained 25.05 acres. The river has moved its bed east abutting the land in Section 30, so that at time of trial there was 56.34 acres of land accreted to Lot 5. The total land in Lot 5 is now 95.59 acres. To Lot 6 there has accreted 76.47 acres, making a total acreage in Lot 6 of 101.52 acres. The present area of Lots 5 and 6, with the accreted lands, equals 197.21 acres, broken down into 64.4 acres of patented land and 137.81 acres of accreted land.

The evidence further showed that on September 20, 1963, plaintiffs met the defendant Sarkeys at Taloga, and after a conversation on the street, went with him to a combination law and abstract office. Here the transaction was consummated, with one Evans, an employee of the abstract office, actually preparing the oil and gas lease in question.

John and Mary Briggs, plaintiffs, both testified that they watched Evans type the lease. That he put an original and one copy in the typewriter, watched him write the description of the land in the lease, watched him remove the lease from the typewriter and reinsert it to fill out the acknowledgment on the reverse side, after which he removed the original and copy from the typewriter, separated them and laid them side by side on the desk. That both plaintiffs read both copies of the lease, signed the original and picked up the carbon copy for their files. Both testified unequivocally that when they executed the original of the lease, the land description written on the lease was as follows:

The North half of the Northeast quarter (N½ NE¼) and the Southwest quarter of the Northeast quarter (SW¼ NE¼)

and the West half of the Southeast quarter (W½ SE¼) of Section Nineteen (19) and Lots Five (5) and Six (6) of Section Thirty (30)

and that on the original of the lease, at the time they signed it, the language "With all *reparian* rights and privileges" did not appear.

Defendant Sarkeys' testimony as to the happenings concerning the preparation and execution of the lease parallel that of the plaintiffs Briggs, except he testified that after Evans had typed the lease, he picked up the original and read it and noticed that the riparian rights had not been included, advised Evans of this, and that Evans thereupon placed only the original of the lease back in the typewriter and wrote below the description, the words "with all reparian rights and privileges". That all this was done in the presence of the Briggs and that after the additional language was inserted, the plaintiffs each executed the original of the lease.

It was not controverted by either party that at the time of the execution of the lease, that defendant Sarkeys gave to the plaintiffs a check in the sum of $184.40 as the first year's rental.

The evidence further showed that defendant Sarkeys did not record the lease in question until some nine months after its execution.

Both plaintiffs testified that they had kept their copy of the lease, with various other papers, in their home, and that it was not until September 15, 1961, that they learned that the original of the lease contained the additional language. That this had come to their attention when they were shown an abstract of the property by a representative of the defendant Sinclair, who came to their home to have them sign a ratification of the lease. The copy of the lease that plaintiffs retained for their files did not contain the additional language.

The evidence also showed that defendant Sarkeys had sold and assigned to the defendant Sinclair one-half of his interest in the lease in December of 1961.

The evidence offered by plaintiffs as to the number of acres they were leasing to defendant Sarkeys conflicts with defendant Sarkeys' version of the matter.

Plaintiff John Briggs testified that when he saw defendant Sarkeys on the street at Taloga, that he asked him if he would be interested in leasing some minerals in Section 19. That Sarkeys said he might, and upon plaintiff Briggs asking him his price per acre, defendant Sarkeys replied that he only paid a dollar an acre for a ten year lease. Plaintiff Briggs then testified that he told defendant Sarkeys that he had about 185 acres of royalty and a lot of built up accreted land, and that if a dollar an acre was all he would pay that he would not lease him the accreted land. That defendant Sarkeys then said that he would take it.

Defendant Sarkeys then testified that the first time he talked to plaintiff John Briggs was in the abstract office, and not on the street. That Mr. Evans had advised him that plaintiffs had some land to lease, that Evans pointed it out on a map, that he told Evans he would take it, that Evans then left the office and returned with Mr. and Mrs. Briggs and that after Mr. Evans introduced him to them, he had no further conversation with them, as Evans busied himself with the typing of the lease.

Evidence was also adduced to show that wells were drilled both in Section 19 and Section 30, and that the well in Section 30 was finalized as a gas well, and that the plaintiffs shared in the production from this well. This producer was completed on October 10, 1961, and it was not until December 12, 1961, that the plaintiffs filed this suit.

It was also shown that plaintiffs, by a quiet title action filed on September 7, 1961, quieting plaintiffs title to the aforementioned Lots 5 and 6, including the accretion thereto. Defendant Sarkeys was not made a party to this action.

A letter, written by plaintiff John Briggs to the defendant Sarkeys, under the date of June 23, 1956, was received in evidence. Pertinent portions of that letter are as follows:

"You have the oil lease on my land located in Sec. 19 and 30 of 17–17 Dewey Co. We have mineral rights that we might be interested in selling on this land if you would want to buy. * * * If you are interested let us know."

The above letter does not refer to accretions or suggest that plaintiffs own or claim to own any unleased mineral acreage in either Section 19 or 30.

It was also shown that in May of 1960, plaintiffs executed and delivered a certain right-of-way agreement, which covered, among other lands, said Lots 5 and 6. The agreement makes no reference to accretions, and the pipe line company was allowed to lay its line across a portion of the accreted land without objection from the plaintiffs.

The defendants also offered the testimony of an expert who testified in substance that the typewritten words "with all reparian rights and privileges" were written on the same typewriter as the rest of the oil and gas lease and that it was written at the same time as the rest of lease.

On the original of the lease, the word riparian is spelled *reparian.* Defendant Sarkeys, when asked to spell the word, also spelled it *reparian.* Plaintiffs assert that this is highly indicative of the fact the defendant Sarkeys himself inserted the additional language in the lease, after it had been executed and delivered to him by the plaintiffs.

The accretions to the land in question, Lot 5 and Lot 6, referred to in the beginning of this opinion, were based on the testimony of a professional engineer, who testified that he used as a basis for the acreage set forth, the original government survey of 1873 and 1874, plus aerial photographs taken in 1957.

From this evidence, the trial court, sitting without a jury, held that the petition of the plaintiffs was not supported by the evidence and rendered judgment for the defendants.

The correctness of the trial courts ruling is challenged by the plaintiffs on the basis of two propositions. Their first proposition is to the effect that an oil and gas lease bargained for on the basis of a per acre price does not cover accreted land in excess of the stipulated acreage. As an integral part of this proposition, plaintiffs claim that they have the right to show by parol evidence that it was intended that the lease should cover only patented lands and not accreted lands. Plaintiffs cite the dissenting opinion in the Kansas case of Cushenberry v. Phillips Co., 119 Kan. 478, 240 P. 400 (1925), as authority for their proposition. In that case, the majority opinion was to the effect that where the lessee paid $1.00 per acre for a lease on the basis of 131 acres of patented land, parol evidence could not be admitted to explain the meaning of the description, and that the lease covered an additional 44.76 acres of accreted land. The dissent in the case maintained that parol evidence should have been allowed to explain the original description in the lease.

In our research on the matter, we find no Oklahoma decision in point as to the factual situation which we have here, but we do find that we have heretofore, in the case of Braddock v. Williams, 182 Okl. 5, 75 P.2d 1139, adhered to a rule that negatives plaintiff's position under his first proposition. In the Braddock v. Williams case, supra, we laid down the rule that a conveyance by lot numbers of land bordering on a water course purporting to convey a stated acreage corresponding with that lying within the meander line established by government survey is not limited in extent by the stated acreage, but includes all accretions existing at the time of the conveying instrument, since the water course, although shifting, and not the meander line is the boundary. See also the case of Johnson v. Butler, 206 Okl. 632, 245 P.2d 720, wherein we held that accretions become a part of the land to which

they are attached, title to which passes with the conveyance of such land, unless specifically reserved or excepted. ·The United States Circuit Court of Appeals, in 1960, in deciding a case from Oklahoma, Pasotex Petroleum Company v. Cameron, 10 Cir., 283 F.2d 63, reiterated the above rule in holding that an oil and gas lease of lands described by legal subdivision conveyed accreted lands and an assignment of a lease, without reservation or exception, likewise transferred the accreted lands.

■ Applying the rule of these cases to the matter at hand, we are constrained to hold that by the original description of the oil and gas lease defendant Sarkeys did lease all of Lots 5 and 6, including the accreted land which had become attached thereto.

Plaintiffs then argue that they should have been allowed to show by parol evidence that they intended to lease only the patented lands to defendant Sarkeys, and not the accreted land. A careful reading on the transcript reveals that both of the plaintiffs, on direct and cross-examination, were allowed to testify in great detail as to what lands they intended to lease to defendant Sarkeys, and therefore we must consider that part of their argument as of little value. That the trial court did not place much reliance upon their testimony in this regard is immaterial. They were allowed to so testify.

■ Next, we must consider the effect if any, of the language that plaintiffs alleged defendant Sarkeys added to the original of the oil and gas lease after it was executed by them. Having already held that the accreted lands went with the patented lands, as set out above, we consider it immaterial as to whether or not the additional language was or was not added to the original lease. Such riparian rights and privileges as there were went with the accreted land. The adding of the additional clause, if in fact it was added after the execution of the original lease, did not materially alter the lease. If it did anything, it conveyed riparian rights which were already in existence. As stated in the case of Wayne County National Bank v. Kneeland, 61 Okl. 265, 161 P. 193, in determining whether an alteration is material, the test is not whether the liability of the parties is increased or reduced, but whether the instrument will have the same legal effect after the alteration as before. In this instance, there could be no change in the legal effect of the oil and gas lease, with or without the additional language.

■ The trial court, after having observed the witnesses, and listening to the testimony found that plaintiffs' position was not supported by the evidence offered. The evidence was clearly in conflict, and we have heretofore held and are committed to the rule, that in an equitable proceeding, where the evidence is in conflict, the findings of the trial court will not be set aside unless, after a consideration of the entire record, it appears that such findings are clearly against the weight of the evidence. Nelson v. Daugherty, Okl., 357 P.2d 425. We have reviewed the evidence in this case and we find that the trial court's findings are in accord with the weight of the evidence. Affirmed.

DAVISON, WILLIAMS, BLACKBIRD, BERRY·and LAVENDER, JJ., concur.

JACKSON, V. C. J., concurs in results.

HODGES, J., dissents.